IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

JEFF GREGG AND JOEY GREGG,      )
                                )
        Plaintiffs,             )
                                )
v.                              ) CIVIL ACTION NO. 98-PWG-0468-M
                                )
TAMMI HINTON GREGG, THE GOODYEAR )
TIRE & RUBBER CO., AND AETNA/   )
U.S. HEALTHCARE,                )
                                )
        Defendants.             )


TAMMY K. GREGG,                 )
                                )
        Plaintiff,              )
                                )
v.                              ) CIVIL ACTION NO. 98-PWG-0469-M
                                )
AETNA/ LIFE INSURANCE CO., THE  )
GOODYEAR TIRE & RUBBER CO., AND )
JEFFREY A. GREGG, and JOEY L. GREGG, )
                                )
        Defendants.             )

**ENTERED**

**MAR 3 1 2000**

MEMORANDUM OF OPINION

These actions were originally filed in state court and were removed to the United

States District Court for the Northern District of Alabama because the claims arise under the

Employee Retirement Income Security Act of 1974 (ERISA). These actions were subsequently

consolidated as they involve the same parties, life insurance plan and pension plan. Tammy K.

Gregg is the widow of Billy Ladon ("Don") Gregg.[1] Tammy and Don had been married

approximately two months at the time of Don's death. Jeff Gregg and Joey Gregg are the adult

---

[1]     Don Gregg is also sometimes referred to in the depositions as "Billy," "Tom" or "Tom Dooley."

sons of Don Gregg.[2]  In CV 98-AR-0469-M, Tammy Gregg names as defendants Aetna Life

Insurance Company, Goodyear Tire and Rubber Company, Jeffrey A. Gregg, Joey L. Gregg, 1950

Pension Plan for Goodyear Tire and Rubber Company, Life Insurance for Hourly Employees at

Designated Locations Plan and Wingfoot Corp.[3]  In counts 1, 2, 3, and 4 of her amended complaint,

Tammy alleges she is entitled to Don's pension and life insurance benefits.  In counts 5 and 6 she

alleges that defendants have breached their fiduciary by unreasonably delaying in paying benefits

due and failing to investigate the facts of plaintiff's claims for benefits.  In count 7, plaintiff alleges

that defendants failed to timely provide her with plan documents in violation of 28 U.S.C. § 1132(c)

and that she is entitled to the maximum statutory penalty as a result thereof.  In count 8, plaintiff has

alleged that Jeff and Joey engaged in tortious interference with the contractual and business

relationships between plaintiff, Goodyear, the plans and Aetna.  Plaintiff alleges in count 9 that

Jeffrey and Joey have interfered with her rights under ERISA and that Goodyear and Aetna have

permitted them to do so.  Tammy seeks a trial by jury as to all claims for which she is entitled to trial

by jury.

        In CV 98-PWG-0468-M Jeff Gregg and Joey Gregg have named as defendants

Tammy Gregg, Goodyear Tire and Rubber Company and Aetna/U.S. Healthcare.  In counts 1 and

2, Jeff and Joey claim entitlement to the full proceeds of the life insurance policy on Don Gregg.

In count 3, Jeff and Joey state a state law claim for conversion against Tammy.  In count 4, Jeff and

Joey state a state law claim for false representations against Tammy.  In count 5 Jeff and Joey state

---

[2]    For the sake of clarity, the court will generally refer to the various Greggs by their first names.

[3]    Aetna, Goodyear, 1950 Pension Plan, Life Insurance Plan and Wingfoot will be referred to collectively as the Goodyear defendants unless specific reference to a single defendant is intended.

a state law claim for breach of fiduciary duty against Tammy. Jeff and Joey seek a trial by jury on their state law claims against Tammy.

The court has before it the motions for summary judgment filed by all parties. The parties have consented to the magistrate judge's jurisdiction pursuant to 28 U.S.C. § 636(c).

### Standard of Review

Summary judgment is appropriate only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Rule 56, *Federal Rules of Civil Procedure*. In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be `no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving

3

> party's case necessarily renders all other facts
> immaterial." [Citation omitted]. Thus, under such
> circumstances, the public official is entitled to
> judgment as a matter of law, because the plaintiff has
> failed to carry the burden of proof. This rule
> facilitates the dismissal of factually unsupported
> claims prior to trial.

898 F.2d at 1532.

### Statement of the Facts

The following relevant facts are undisputed or, where disputed, such disputed facts are so indicated by the court.[4/] On December 5, 1995 Don and Tammy were married. (Dep. of Tammy Gregg, November 30, 1998, at 140; Dep. of Lloyd Matthews, November 5, 1998, at Pl.'s Ex. 7 (marriage certificate)). On December 22, 1995 Don was diagnosed as having a mass in his brain and admitted to the hospital in Gadsden. (Dep. of Lloyd Matthews at Pl.'s Ex. 2 (Medical Records of Billy Ladon Gregg)). Don was later admitted to UAB hospital where a shunt was put in Don's brain to relieve pressure. Don was told that he probably had approximately six weeks to live. (T.Gregg Dep. at 105; Matthews Dep. at Pl's Ex. 2 (Medical Records of Billy Ladon Gregg)).

On January 2, 1996 Don and Tammy went to attorney George Ford's office to discuss Don's will. Later that day, Don executed his will and a power of attorney making Tammy his attorney in fact. (T.Gregg Dep. at 6-9, and Def.'s Ex. 1). Tammy maintains that Don was competent to execute the will and power of attorney on January 2, 1996 (T.Gregg Dep. at 118); however, Joey does not agree that his father was competent to execute the power of attorney on January 2, 1996. (See Gregg affidavit, Document #40). Under the terms of the 1950 Pension Plan a surviving spouse was only entitled to pension benefits if she had been married to the employee/participant for more

---

[4/]    Because plaintiffs in both actions as well as defendants have filed motions for summary judgment, the court
       cannot view the evidence in the light most favorable to the non-moving parties since all parties are movants.

4

than a year or if the employee/participant had already elected to take his retirement at the time of his death. (Matthews Dep. at 31). Under "Option A," Tammy would be entitled to $1,110.00 for the first 60 months and then $810.41 thereafter. (Matthews Dep. at 43-46). (See also Summary Plan Description (Tab C of Evidentiary Submission) at 57-62 (G0260-G0265). Don had worked for Goodyear for thirty years. (Matthews Dep. at 18, 45).

On or about January 2, 1996 Matthews met with Don and Tammy at the Goodyear Union Hall where Don and Tammy explained Don's medical situation and that Don wanted to retire out. Matthews was told that Don had a blastoma tumor, that he had a shunt in his brain, and that he did not have a life expectancy of more than six weeks. Don told Matthews that he wanted the most for Tammy. There was no discussion during this meeting or at any other time about changing the life insurance plan to designate Tammy as a beneficiary. (Matthews Dep., 111-116). Tammy admits that she did not ever discuss changing the beneficiary designation on the life insurance policy with either Don or Matthews. (T.Gregg Dep., 90-91). At the January 2, 1996 meeting Matthews told Don and Tammy that he still needed a letter from a doctor regarding Don's condition and that he would take care of everything. (T.Gregg Dep. at 91-95; Matthews Dep. at 27, 29-32).

Don and Tammy had a second meeting with Matthews on or about January 5, 1996. Tammy asserts that by this time Matthews had been given a copy of the power of attorney, and he stated that he had everything he needed, including the statement from the doctor. (T.Gregg Dep. at 103-106, 117, 135-136, 149, 169-170). She further asserts that Don expressed the urgency of getting the retirement papers done as soon as possible. (T.Gregg Dep. at 159). The Goodyear defendants dispute these facts relying on the deposition testimony of Lloyd Matthews. Matthews testified that he had explained to Tammy and Don why Don should retire before his death, but as close to death

as possible, and thus maximize the amount of life insurance benefits.  (Matthews Dep. at 31).[5]

Matthews testified that he told Tammy and Don that they needed to get a letter from a doctor stating

that Don had less than five months to live.  (*Id.*)  Matthews requested that Tammy and Don keep him

"updated" and told them that they could get the doctor's letter in the meantime.  (*Id.*)  Matthews

testified: "But I left it up to them to let me know when they wanted to move on it."  (*Id.* at 33, *see

id.* at 76).  Goodyear and Matthews did not receive the doctor's letter until January 23, 1996, at the

earliest.  (Matthews Dep. at 39, Exhibit 8).

Tammy indicated she had difficulty reaching Mr. Matthews after January 5.  She

alleges that on about three occasions she got his answering machine but he did not call her back.

She also states she went by to see him on one occasion but was not able to see him.  She left a

message.  Mr. Matthews did call her back on one occasion.  (T.Gregg Dep. at 151-152).  The

Goodyear defendants dispute Tammy's inability to get in touch with Matthews.

Mr. Matthews testified that he always returns phone calls and that his assistant is very

good about giving him messages.  (Matthews Dep. at 67-68).  Mr. Matthews says that he spoke to

Tammy on a number of occasions between January 6, 1996, and February 1, 1996.  (*See id.* at 33,

76).

Tammy alleges that having become frustrated with Mr. Matthews's

unresponsiveness, in mid-January she went to see David Tolleson at the Goodyear plant in Gadsden

and she called him from the guard shack.  She states that Mr. Tolleson was "very rude," was "very

angry," was "mean," and he told Tammy that she was going "out of the chain of command" and that

she "had better not call him again" but that she had to "go through Mr. Matthews."  (T.Gregg Dep.

---

[5]  Mr. Matthews explained that the optional life insurance benefits reduce 25 percent every quarter after retirement.  (Matthews Dep. at 28).

at 52-53, 95-97). Tammy attempted to make an appointment to come back and meet with Mr. Tolleson, but he would not see her and "became extremely rude and upset and very hostile" and told her that she "needed to go back to the union hall." (T.Gregg Dep. at 153-154). These factual assertions concerning Tammy's contact with Tolleson are directly contradicted by the affidavit of David Tolleson. Mr. Tolleson stated that employees were free to come to him to retire, that he spoke to Tammy during January 1996, and that he never was rude, angry, mean or hostile to Tammy. (Tolleson Aff, ¶ ¶ 3-4). Additionally, to the extent there were any "chain of command," Mr. Tolleson says he would be the bottom link and he never told Tammy that she was going outside of any chain of command. (Tolleson Aff. ¶ ¶ 3-4).

Tammy also attempted to contact Goodyear headquarters in Akron, Ohio and states she received the same response from them that she received from Mr. Tolleson. That is, she was told she had to go through the "chain of command." She was referred to Mr. Tolleson who was the one in charge as far as the Goodyear agents in Akron were concerned. (T.Gregg Dep. at 44,153-154).

In mid-January 1996 Don went into a coma. (T.Gregg Dep. at 88-89). Tammy estimates that between January 5 and February 1, 1996 she attempted to get the retirement papers executed between six and eight times. (T.Gregg Dep. at 158; see also T.Gregg Dep. at 43). Tammy retained the services of Charles Boyd, another lawyer, who was able to set up a meeting on February 1, 1996 at 3:00 p.m. Tammy later received a call saying that the meeting was being postponed for a half-hour. (T.Gregg Dep. at 12, 22-23, 44, 138, 158). Goodyear asserts that Tammy called Matthews on the morning of February 1, 1996 and conveyed for the first that time that the situation was bad and they needed to ahead and sign the forms. (Matthews Dep. at 40, 76). David Tolleson (at Goodyear) and Matthews first received the power of attorney by fax at the end of the prior day,

7

January 31, 1996. Mr. Matthews called Mr. Tolleson after speaking with Tammy on the morning of February 1, 1996 and explained that they needed to sign the pension forms for Don.   Mr. Tolleson responded that he would get all the forms together and be at the Union hall at 4:00 p.m. for the signing. (*See id.* at 40).

Before Tammy left for the meeting, Joey was waiting for her and told her he knew where she was going.  Jeff and Joey told her that they thought they deserved a part of the pension. Tammy, Jeff and Joey agreed to split everything 50% to Tammy, 25% to Joey and 25% to Jeff. Joey rode with Tammy to the union hall. (T.Gregg Dep. at 17-19).

Tammy states that she arrived at the union hall at approximately 3:30 p.m. and was in the room with everyone by 3:40 p.m. (T.Gregg Dep. at 16, 77-78).  When she arrived, Charles Boyd was there, as were Joey Gregg, David Tolleson, Lloyd Matthews, Mickey Williams, Gerald Minshew, and Ken Phillips. (T.Gregg Dep. at 16, 19; Matthews Dep. at 129). The introductions and going over the pension documents took about four or five minutes. (T.Gregg Dep. at 83).  After Mr. Tolleson explained the three pension options and after Tammy told Joey she was going to elect "Option A," which they understood was 100% for five years and than a lesser amount for life or until remarriage but would only be paid to her, Tammy then went back in to the meeting and signed the election for "Option A." (T.Gregg Dep. at 19-21, 65-67, 71-75, 83, 163-165; Matthews Dep. at Pl.'s Ex. 2).  Mr. Tolleson then asked Tammy about the life insurance plan and she changed the beneficiaries to herself for 50% and to Joey and Jeff for 25% each. (T.Gregg Dep. at 21; Matthews Dep. at Pl.'s Ex. 3).  Tammy testified that all of the documents were executed by 4:00 p.m. (T.Gregg Dep. at 22, 78-80).  It is undisputed that the pension documents were signed first. (T.Gregg Dep. at 82, 85-86; Matthews Dep. at 77).

8

Mr. Matthews testified that the meeting on February 1, 1996 was scheduled to begin at 4:00 p.m. and that the meeting began at 4:00 p.m. (Matthews Dep. at 74, 78-79). He further testified that it normally takes about 30 minutes to process a disability pension. (*Id*. at 80). In his affidavit Joey stated that he and Tammy arrived at the Union Hall at 4:00 p.m. or later and that it took Mr. Tolleson ten or fifteen minutes to explain the various options on the pension. Joey and Tammy then had a discussion concerning their agreement and Tammy's decision to choose a different option. Joey states that by the time Tammy signed the pension papers it was 4:30. Joey states that he then called Jeff who told him that Don had died. At about 4:45 p.m. Tammy and everyone else left the conference room. (Joey Gregg's affidavit, document #40).

After the meeting was over Tammy was told that they had received a call that Don had passed away. (T.Gregg Dep. at 80-82, 85). The Death Certificate for Billy Ladon Gregg states that the time of death was approximately 4:00 p.m. (T.Gregg Dep. at 112-113, "Jeff Gregg Exhibit 1"). Lloyd Matthews testified that they received notice of Don's death about the middle of the meeting or between the signing of the pension documents and the life insurance documents. (Matthews Dep. at 77). Tammy contends that all of the documents were signed when the notice was received. (T.Gregg Dep. at 22, 78-80).

In a letter to an agent of Goodyear dated April 4, 1997 counsel for Tammy requested information relating to the benefits available to her as the widow of Billy Ladon Gregg, including information relating to pension or retirement plan benefits, savings plan benefits, life insurance benefits, and vacation plan benefits. This letter also requested copies of documents executed by Tammy on behalf of Billy Ladon Gregg in connection with her retirement of Billy Ladon Gregg. This letter included an "Authorization for Release of Employment Information" signed by Tammy.

The letter was sent to the Gadsden, Alabama location of Goodyear, and a copy was sent to another agent of Goodyear at its Akron, Ohio location. (T.Gregg Dep. at Def.'s Ex. 3).

Counsel for Tammy sent another letter dated August 13, 1997 to agents of Goodyear at its Akron, Ohio location and its Gadsden, Alabama location. This letter requested the same information as the April 4, 1997 letter within ten days. No response was received until September 24, 1997. While this letter provided information about the Employee Savings Plan and included a distribution form under this plan, it did not contain the other requested documents. (T.Gregg Dep. at Def.'s Ex. 3). On October 2, 1997 Tammy received a letter concerning the Life Insurance Plan and asserting that the power of attorney executed by Billy Ladon Gregg did not give her the authority to make a beneficiary change and that the beneficiary change was made after the death of the insured. By letter dated October 14, 1997 counsel for Tammy responded to the October 2, 1997 letter from Aetna, informing Aetna that there was a dispute over the proceeds of the life insurance requesting that Aetna delay any payment of the proceeds to another party. (T.Gregg Dep. at Def.'s Ex. 3).

In letters dated December 8, 1997 counsel for Tammy again requested agents of Goodyear at both its Akron, Ohio, location and its Gadsden, Alabama, location to forward all documents signed and presented to Tammy in February 1996. Also by a letter to an agent of Aetna dated December 8, 1997, counsel for Tammy again requested a copy of the life insurance policy and all documentation which designates beneficiaries under the policy. (T.Gregg Dep. at Def.'s Ex. 3). By letter dated January 9, 1998, an attorney for Goodyear informed Tammy's lawyer that the authorization for release of employment records signed by Tammy was for the release of information relating to Tammy. The letter requested an authorization signed by Tammy that related "more specifically to the situation regarding the documents she signed either as power of attorney

10

for or beneficiary of Billy Ladon Gregg." The requested documents were not provided. (T.Gregg

Dep. at Def.'s Ex. 3).  On or about January 9, 1998 an agent for Aetna sent to counsel for Tammy

a letter with the requested beneficiary designations enclosed.  The letter also stated that Aetna was

going to pay the insurance proceeds according to the beneficiary designation of November 9, 1994,

unless legal and factual information to support Tammy's claim was received by January 30, 1998.

No other requested documents were provided.  (T.Gregg Dep. at Def.'s Ex. 3).

Tammy never received notice of any action granting or denying her application for

the pension benefits under the pension plan.  (T.Gregg Dep. at 160-161).  Goodyear's letter dated

September 24, 1997, however, stated:

> Our records indicate that Mr. Gregg died as an active
> associate on February 1, 1996.
>
> . . .
>
> Under the 1950 Pension Plan, a pre-retirement benefit
> is payable to the surviving spouse if they had been
> married one-year prior to death.  Our file indicates
> that Tammy Gregg had married the participant on
> December 5, 1995, representing a period of time less
> than one year.  As this requirement had not been met,
> no benefit under the 1950 Pension Plan is payable to
> the surviving spouse.

Tammy filed her law suit on January 29, 1998.  Jeff and Joey filed their law suit on February 2,

1998.

I.     Motion for Summary Judgment by Goodyear Defendants

    A.     The Life Insurance Benefits

Defendants admit that Aetna should pay $60,000 in benefits to the proper

beneficiaries of the Life Insurance Plan, once that determination is made by the court.

11

B.    Failure to Provide Plan Documents Claim

Tammy claims she is entitled to receive the maximum statutory penalty provided by 29 U.S.C. § 1132(c)(1) and 29 C.F.R. § 2570.502c-1 from May 4, 1997 until June 5, 1998 due to defendants' failure to provide all of the requested documents.  (Count 7 of Tammy Gregg's First Amended Complaint).

Defendants argue, and Tammy concedes, that only Goodyear, as the administrator of both the 1950 Pension Plan and the Life Insurance Plan, is the proper defendant to this claim for penalties pursuant to 29 U.S.C. § 1132(c)(1), *Hunt v. Hawthorne Associates, Inc.*, 119 F.3d 888, 914-16 (11th Cir. 1997), *cert. denied,* 523 U.S. 1120 (1998).

Defendants argue that they should not be required to pay penalties of $100 a day based on their failure to provide the documents specified in count 7 of Tammy's amended complaint because those documents are not "plan documents."

Title 29 U.S.C. § 1024(b)(4) provides:

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, <u>or other instruments under which the plan is established or operated.</u> (emphasis added).

It is apparently undisputed that Goodyear did not provide Tammy with the forms executed by Tammy on February 1, 1996.  Goodyear states that it did, however, provide the summary plan description to Tammy's lawyer.  Tammy argues that "there is no evidence that Goodyear ever even provided a summary plan description which would have been included in the broad request by Tammy's counsel in his letter of April 4, 1997 and that "the failure to provide a summary plan description alone is enough to subject Goodyear to the penalty."  (T. Gregg's Memorandum in

Opposition to Goodyear's Motion for Summary Judgment, p.5). Goodyear had no obligation to provide evidence that it had provided plaintiff with the summary plan description because the amended complaint specifically excluded the summary plan description from the documents which were not provided. *See* Tammy Gregg's First Amended Complaint, ¶ 59:

> 59. Until the Rule 26 disclosures in this action, plaintiff did not receive any of the requested documents other than a summary plan description, copies of the life insurance beneficiary designations, and the Employee Savings Plan documents. Although requested at least by April 4, 1997, the beneficiary designations were not provided until January 9, 1998. The other requested documents were received as part of the Rule 26 disclosures on or about June 5, 1998. (emphasis added).

(See also T. Gregg's deposition at 29).

The forms signed by Tammy are not "plan documents" within the meaning of 29 U.S.C. § 1024(b)(4).

In *Allinder v. Inter-City Products Corp. (USA),* 152 F.3d 544 (6th Cir. 1998), *cert. denied,* 525 U.S. 1178 (1999), the Sixth Circuit Court of Appeals held that the claim forms for filing claims were not included within the phrase "other instruments under which the plan is established or operated." The court held:

> From the statute's enumeration of the specific terms "summary plan description," "plan description," "bargaining agreement," and "contract," it is apparent that "other instruments" was meant to refer to documents that provide or contain information *concerning the terms and conditions of the participant's policy.* In a similar vein, the general term "other instrument" is qualified by the phrase "under which the plan is established or operated." 28 U.S.C. § 1024(b)(4). Section 1024(b)(4)'s reference to "other instruments" is thus properly limited to those class of documents which provide a plan

13

participant with information concerning how the plan is *operated*. Claim forms contain none of these qualities. Instead, claim forms are simply documents used in the *ministerial day-to-day processing* of individual claims pursuant to other documents that determine the plan's operation.

Moreover, ERISA's legislative history indicates that Congress did not intend that claim forms be among the materials covered under § 1132(c). "The reporting and disclosure provisions of [ERISA] were intended specifically to insure that plan participants are able to obtain financial information about the plan, as well as information about the benefits which they are eligible to receive." *Arsenault v. Bell*, 724 F. Supp. 1064, 1066 (D. Mass 1989). In the House Report accompanying the passage of ERISA, Congress recognized

> a need for a more particularized form of reporting so that the individual participant knows exactly where he stands with respect to the plan–what benefits he may be entitled to, what circumstances may preclude him from obtaining benefits, what procedures he must follow to obtain benefits, and who are the persons to whom the management and investment of his plan funds have been entrusted.... [T]he safeguarding effect of the fiduciary responsibility section will operate efficiently only if fiduciaries are aware that the details of their dealings will be open to inspection, and that individual participants and beneficiaries will be armed with enough information to enforce their own rights as well as the obligations owed by the fiduciary to the plan in general.

H.R. REP. No. 533, 93d Cong. 2d Sess. 11 (1973), *reprinted in* 1974 U.S.C.C.A.N. 4639, 4649. From the legislative history, it is clear that Congress only intended § 1132(c) "to guarantee that plan participants have *access to the information* they need to protect their interests in the assets and funds being managed by the plan fiduciaries." *Arsenault*, 724 F.

> Supp. at 1066 (emphasis added). There is nothing in the legislative history to indicate that Congress drafted § 1132(c) to insure that plan fiduciaries faithfully execute their ministerial function of completing claim forms for individual plan participants.
>
> Although this is an issue of first impression in this circuit, we note that every court that has considered the question has agreed that a plan participant may not invoke § 1132(c) to collect penalties from an administrator who fails to supply or complete claim forms. *See Arsenault,* 724 F. Supp. at 1065-67; *Clouatre v. Lockwood,* 593 F. Supp. 1136, 1140 (M.D. La. 1984) (plaintiff's "request for benefits does not satisfy the request element that is needed to state a claim upon which relief can be granted under" § 1132(c); *Wesley v. Monsanto Co.,* 554 F. Supp. 93, 98 (E.D. Mo. 1982) ("claim forms are not among the documents specified in the statute."). Because the applicable statutory language, legislative history, and case law demonstrate that claim forms are not among the materials covered by § 1132(c), Allinder cannot make out a claim for a violation of § 1132(c).

152 F.3d at 549.

While Tammy attempts to distinguish the forms she was requesting on the basis that they had been completed, this is a distinction without a difference. Whether completed or not, a claims form does not provide a plan participant with information concerning how the plan is <u>operated</u> and a claims form is therefore excluded from the documents an administrator shall provide a participant under 29 U.S.C. § 1024(b)(4). Goodyear's failure to provide the forms to Tammy does not warrant an imposition of a penalty. *See also Brown v. American Life Holdings,* Inc., 190 F.3d 856, 861 (8th Cir. 1999) ("[W]e agree with the circuits that have construed 'other instruments' as meaning, not any document relating to a plan, but only formal documents that establish or govern the plan."); *McNutt v. J. A. Jones Cons. Co.,* 33 F. Supp. 2d 1375, 1382 (S.D. Ga. 1998) ("Because

Congress has not explicitly provided a statutory penalty for a plan administrator's failure to provide a claims form, the court declines to extend the statute to allow plaintiff's ERISA claim for a statutory penalty to proceed.") The Goodyear defendants' Motion for Summary Judgment is GRANTED and Tammy Gregg's Motion for Partial Summary Judgment is DENIED with respect to count 7 of Tammy Gregg's First Amended Complaint.

      C.    <u>Tortious Interference</u>

        The Goodyear defendants argue that count 8 of the First Amended Complaint alleging a state law claim for tortious interference against "defendants" is pre-empted by ERISA. Tammy responds that the tortious interference claim is not asserted against Goodyear or the other Goodyear defendants but only against Jeff and Joey. (Tammy Gregg's memorandum in opposition to Goodyear's motion for summary judgment, p.8). The Goodyear defendants are therefore entitled to summary judgment with respect to count 8 of Tammy Gregg's First Amended Complaint.

      D.    <u>All Other Claims by Tammy Gregg Against Defendants</u>

          (1)    Defendants other than Goodyear

        Defendants argue that only Goodyear is the proper defendant to counts 3, 5, 6 and 9 as Goodyear is the employer, plan administrator and plan fiduciary. Tammy does not contest that Goodyear is the proper defendant for these claims. Defendants 1950 Pension Plan, the Life Insurance Plan, Wingfoot Corp. and Aetna are therefore entitled to summary judgment as to counts 3, 5, 6 and 9.

          (2)    Defendant Goodyear/Exhaustion

        Defendant Goodyear argues that the plaintiff has failed to exhaust the 1950 Pension Plan's or the Life Insurance Plan's administrative remedies for these claims. Goodyear further argues that these claims should be dismissed because plaintiff did not allege in her complaint or

amended complaint that the Plan's administrative remedies are unavailable or have been exhausted and further the claims must be dismissed because of her undisputed failure to use the available remedies for these claims. In response, plaintiff does not address defendant's argument that plaintiff failed to allege that the administrative remedies were unavailable but instead alleges that she was denied meaningful access to the procedures and should be excused from the exhaustion requirement because Goodyear never responded to the "Application for Pension" form executed by Tammy and then would not provide her with the information she needed to exhaust her remedies." (Tammy Gregg's Memorandum in Opposition, p.9). Specifically, she alleges that she was denied documents describing what remedies the plan made available or that were considered in any decision making and that she was never given a written explanation as to why her benefits were denied in violation of 29 U.S.C. § 1133(1) (1999).

"The law is clear in this Circuit that plaintiffs in ERISA actions must exhaust available administrative remedies before suing in federal court." *Counts v. American General Life and Acc. Ins.*, 111 F.3d 105, 108 (11th Cir. 1997). "[D]istrict courts have discretion to excuse the exhaustion requirements when resorting to administrative remedies would be futile or the remedy inadequate." *Id.*, *citing Curry v. Contract Fabricators, Inc. Profit Sharing Plan*, 891 F.2d 842, 846 (11th Cir. 1990). Likewise, it is within this court's discretion to excuse a plaintiff's failure to exhaust when a plan administrator denies a claimant meaningful access to available review procedures. *See Curry v. Contract Fabricators, Inc. Profit Sharing Plan*, 891 F.2d at 842, 846-47.

The only papers signed by Tammy on February 1, 1996 were apparently the forms that she signed as attorney in fact for Don and which were intended to retire Don as a Goodyear employee and to change the beneficiary designation on Don's life insurance policy. Tammy did not make claim with Goodyear for survivor pension benefits on her own behalf.

17

Goodyear argues that Tammy should not be excused from the exhaustion requirement but, instead, the matter should be remanded to the plan administrator for an out-of-time administrative procedure. The court notes that the Goodyear defendants have alleged that they were unaware until after this law suit was filed that Tammy maintained that the retirement papers were signed prior to Don's death. (See Defendants' Reply to T. Gregg's Opposition, p.6). The parties have declined mediation. The court is of the opinion that there may be a question of material fact concerning the efforts by Tammy to retire Don prior to February 1, 1996, Goodyear's response to those efforts and whether the retirement papers were signed prior to Don's death. Based on the posture of this case, the court concludes that it is not in the best interest of judicial economy to dismiss the ERISA claims due to plaintiff's failure to exhaust. Rather, the court finds it appropriate now that Goodyear is aware of plaintiff's position and all arguments supporting her claim for survivor benefits to STAY this action for a period of time not to exceed sixty (60) days to allow plaintiff to file her claim for survivor benefits under the plan and to allow Goodyear to consider the claim.

Defendant Goodyear's Motion for Summary Judgment is DENIED with respect to counts 3, 5, 6 and 9 of Tammy Gregg's First Amended Complaint. Likewise, plaintiff Tammy Gregg's Motion for Partial Summary Judgment as to counts 3, 5 and 6 of her First Amended Complaint is DENIED.

II.     Motion for Summary Judgment by Jeff and Joey Gregg

Jeff and Joey Gregg argue that they are entitled to summary judgment on the ERISA and state law claims of Tammy and also on their own claim for the full amount of the $60,000 life insurance.

18

A.   Claims of Tortious Interference

The only claims against Jeff and Joey in Tammy Gregg's First Amended Complaint are counts 8 and 9 for tortious interference and interference under ERISA. Tammy alleged that Jeff and Joey made communications, threats and misstatements designed to interfere with Tammy making changes or elections under the Pension and Life Insurance Plans and obtaining benefits thereunder. Jeff and Joey argue that the tortious inference claims are pre-empted under ERISA. Tammy relies on *Morstein v. National Insurance Services, Inc.*, 93 F.3d 715 (11th Cir. 1996), *cert. denied sub nom., Shaw Agency v. Morstein*, 519 U.S. 1092 (1997) in which the Eleventh Circuit held that a fraud claim against a non-ERISA individual insurance agent was not pre-empted by ERISA. Tammy's reliance on *Morstein* is misplaced. In *Morstein*, a plan beneficiary[6] brought suit against the non-ERISA entity's insurance agent, an agent that allegedly fraudulently induced her to change benefit plans and negligently processed her application for insurance. The agent assured plaintiff that the policy that he proposed would provide the same coverage for pre-existing conditions as her current policy. After undergoing total hip replacement surgery, the new insurance company refused payment because the surgery treated a pre-existing condition which was not disclosed during the application process. Morstein alleged that based on the fraudulent inducement of the agent and agency she allowed a separate full-coverage insurance policy to lapse. The agent and agency had no control over the payment of benefits or determination of Morstein's rights under the plan. The Eleventh Circuit in discussing pre-emption observed:

> These same agents currently face the threat of state
> tort claims if they make fraudulent misrepresentations

---

[6]   Morstein was the president, director and sole shareholder of Graphic Promotions and one of two employees of Graphic. Morstein met with the agent of Shaw Agency for the purpose of obtaining a replacement policy of major medical insurance for herself and the other Graphic employee.

19

> to individuals and entitles not governed by ERISA.
> To hold these agents accountable in the same way
> when making representations about an ERISA plan
> merely levels the playing field.
>
> Allowing preemption of a fraud claim against an
> individual insurance agent will not serve Congress's
> purpose for ERISA. As we have discussed, Congress
> enacted ERISA to protect the interests of employees
> and other beneficiaries of employee benefit plans.
> *See Shaw*, 463 U.S. at 90, 103 S.Ct. at 2896. To
> immunize insurance agents from personal liability for
> fraudulent misrepresentation regarding ERISA plans
> would not promote this objective. If ERISA preempts
> a beneficiary's potential cause of action for
> misrepresentation, employees, beneficiaries, and
> employers choosing among various plans will no
> longer be able to rely on the representations of the
> insurance agent regarding the terms of the plan.
> These employees, whom Congress sought to protect,
> will find themselves unable to make informed choices
> regarding available benefit plans where state law
> places the duty on agents to deal honestly with
> applicants.

*Morstein*, 93 F.3d at 723-24. The court concluded that the claims against the independent insurance

agent and agency did not fall within ERISA's pre-emptive scope because "they do not have a

sufficient connection with the plan to 'relate to' the Plan." 93 F.3d at 724.

In *Garren v. John Hancock Mutual Life Insurance Co.*, 114 F.3d 186 (11th Cir. 1997)

plaintiff alleged that his employment benefit plan wrongfully denied his son's medical claims

presenting both ERISA claims and a state law claim for tortious interference with the contract. The

court concluded that John Hancock was the company servicing the plan but not the plan

administrator. The court held that "A party's state law claim 'relates to' an ERISA benefit plan for

purposes of ERISA preemption whenever the alleged conduct at issue is intertwined with the refusal to pay benefits." 114 F.3d at 187. The court further held:

> Plaintiff argues that if John Hancock is neither a party to the agreement nor the plan administrator as it asserts, ERISA preemption does not apply to state claims against it. That argument is foreclosed by the decision in *Morstein v. National Ins. Serv.*, 93 F.3d 715, 722 (11th Cir. 1996) (en banc), *cert. denied,* ___ U.S. ___, 117 S.Ct. 769, 136 L.Ed.2d 715 (1997), in which the Court held that where the state law claim brought against a non-ERISA entity affects the relationship between the ERISA entities, the state law claim is preempted. <u>The proper focus is not on the relationship between the parties but on the relationship between the alleged conduct and the refusal to pay benefits.</u> The allegation here that the prepayment agreement required under the Plan imposed obligations not contained in the Plan's summary plan description involves the proper administration of the ERISA.

114 F.3d at 188. (Emphasis added).

Because plaintiff specifically alleges that the actions of Jeff and Joey have interfered with her obtaining plan benefits, the tortious interference claims are preempted by ERISA. Jeff and Joey Gregg's Motion for Summary Judgment is GRANTED as to counts 8 and 9 of Tammy Gregg's First Amended Complaint.

B.   Claim of Entitlement to Full Amount of the Life Insurance Proceeds

Jeff and Joey argue that they are entitled to the full amount of their father's $60,000 life insurance policy because, under Alabama law, Tammy lacked authority pursuant to the power of attorney to make herself the beneficiary of the life insurance policy.

Powers of attorney are to be given strict construction, limiting the powers to those expressly granted and such incidental powers necessary to effect the expressed powers. *Dillard v.*

*Gill*, 231 Ala. 662, 166 So. 430 (Ala. 1936). Transfers of real and personal property by one whom

has been entrusted with a power of attorney to himself is not authorized under a power of attorney

unless such powers are expressly granted. *Lisenby v. Simms*, 688 So.2d 864, 867 (Ala. Civ. App.

1997).          Tammy responds that the power of attorney granted her the power "[i]n general, to

do all other acts, deeds, matters or things whatsoever in or about my estate, property and affairs ...

as fully and effectually to all intents and purposes as I could do in my own person if present."

Plaintiff further attempts to distinguish *Dillard* and *Lisenby* by making the artificial distinction that

*Dillard* and *Lisenby* involved the transfer of property while the present case only involves benefit

elections under employee benefit plans. This overlooks the role of the attorney in fact:

> ... [W]hen one accepts the power of attorney, she
> impliedly covenants to use the powers bestowed upon
> her for the sole benefit of the one conferring that
> power on her, consistent with the purposes of the
> agency relationship represented by the power of
> attorney. ... The principal-agency relationship is
> fiduciary in nature and imposes upon the agent a duty
> of loyalty, good faith, and fair dealing. ... An agent is
> not permitted to occupy a position that would allow
> her to profit as a result of that agency relationship.

*Sevigny v. New South Federal Sav. and Loan Ass'n,* 586 So.2d 884 (Ala. 1991).

          Tammy also argues that the court must look to the intent of the parties and the

surrounding circumstances at the time the power of attorney was granted. She argues that the reason

for the power of attorney was to allow her to make changes that would have the effect of "leav[ing]

Tammy everything."[2/]  Matthews testified that Don's statement concerning what he wanted for

---

[2/]          Matthews testified concerning what Don told him about his intent:
>                "I want to leave Tammy everything I can" (Matthews depo. at 27), or "I want to do
> everything I can for Tammy" (Matthews depo at 30), or "I want Tammy to get everything
> I can on my pensions" (Matthews depo. at 32) , or "I'm going to make sure Tammy gets
> everything that she's entitled to under the pension (Matthews depo at 75).

Tammy was made in the context of discussing Don's retirement options.  Matthews never discussed life insurance with Don or Tammy (Matthews depo. at 30, 111-12) nor did he have any discussion with Don, Tammy, Joey, Jeff or Tammy's attorney about changing the life insurance benefits on Don's life insurance plan.  (Matthews depo. at 115-16).  Tammy testified that she never discussed life insurance with her husband; however, she and her husband discussed his pension with Matthews.  (T.Gregg Dep. at 90-91).  Based on the lack of specificity of the power of attorney and the deposition testimony of Tammy and Matthews, the court concludes that it was not the intent of Don to give Tammy power of attorney to change the beneficiaries on his life insurance policy to include herself as a beneficiary.[8]  In the absence of an express grant of such power, Tammy lacked authority to make herself a beneficiary of Don's life insurance policy.

Jeff and Joey Gregg's Motion for Summary Judgment is GRANTED to the extent that Jeff and Joey are entitled to the full proceeds of Don's $60,000 life insurance policy in equal shares.

A separate order consistent with the Memorandum of Opinion will be entered simultaneously herewith.

As to the foregoing it is SO ORDERED this the 30th day of March, 2000.

_____
PAUL W. GREENE
UNITED STATES MAGISTRATE JUDGE

---

[8]    The court notes that there is a distinction to be made between Tammy retiring Don and Tammy including herself as a beneficiary on the life insurance policy.  In the first instance, not only was the retiring clearly the intent of Don, Don would also have benefitted from retirement by drawing a pension for the duration of his life.  Further, by retiring Don, Tammy would not be adversely affecting any benefits due to Jeff and Joey while benefitting herself.