FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

01 JAN 25  PM 2: 07

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| JEFF GREGG AND JOEY GREGG, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 98-PWG-0468-M |
| | ) |
| TAMMI HINTON GREGG, THE GOODYEAR | ) |
| TIRE & RUBBER CO., AND AETNA/ | ) |
| U.S. HEALTHCARE, | ) |
| | ) |
| Defendants. | ) |
| | |
| TAMMY K. GREGG, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 98-PWG-0469-M |
| | ) |
| AETNA/ LIFE INSURANCE CO., THE | ) |
| GOODYEAR TIRE & RUBBER CO., AND | ) |
| JEFFREY A. GREGG, and JOEY L. GREGG, | ) |
| | ) |
| Defendants. | ) |

ENTERED

JAN 2 5 2001

MEMORANDUM OF OPINION

On March 31, 2000 the court entered a Memorandum of Opinion disposing of certain issues and staying the action while Tammy Gregg (herein "Mrs. Gregg) exhausted her administrative remedies under 1959 Pension Plan. This case is before the magistrate judge following Mrs. Gregg's exhaustion of her administrative remedies for review of Goodyear's decision based upon the

administrative record[1] as well as consideration of the amended motion for summary judgment filed by Jeff and Joey Gregg. (Document #58).

During a status conference conducted on November 16, 2000, counsel for defendants indicated they saw no need for live testimony while plaintiff indicated she sought review of Goodyear's decision *de novo* and as a part of that review the court should hear the live testimony of witnesses where the facts are in dispute. The court concludes that live testimony is not necessary. The parties have identified the following alternative issues remaining:

(1)    Whether Mrs. Gregg is entitled to survivor benefits based on the retirement of Don Gregg prior to his death;

(2)    Whether Mrs. Gregg is entitled to survivor benefits based on substantial compliance with the requirements necessary to effect the retirement of Don Gregg;

(3)    Whether Goodyear breached its fiduciary duty in delaying the retirement of Don Gregg;

(4)    Whether Jeff and Joey Gregg are liable to Mrs. Gregg based on interference with ERISA benefits.

---

[1]    The Pension Board observed:

> The claim for benefits is intertwined with litigation between claimant [Tammy Gregg], Goodyear, Aetna Life Insurance, and the deceased employee's sons, Jeff and Joey Gregg. ... The nature of this appeal hearing was unique because of the extensive amount of evidence resulting from discovery in the litigation described above."

The only evidence submitted to Goodyear which did not appear to already be before this court was the affidavits of Deborah Dugger and Kera Duval and the statement of Brand Walton, an attorney specializing in employee benefits law. The court has considered this new evidence when reviewing Goodyear's decision.

Standard of Review for Legal Determinations

The standard of review in consideration of a challenge to the legal determination of the administrator or fiduciary resulting in the denial of ERISA benefits varies with the discretion, if any, vested in the administrator or fiduciary[2] and the potential for a conflict of interest.

In *Firestone Tire & Rubber Company v. Bruch*, 489 U.S. 101 (1989), the United States Supreme Court established *de novo* judicial review of an ERISA benefits denial decision "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. at 115.

In *Paramore v. Delta Air Lines, Inc.,* 129 F.3d 1446, 1449 (11th Cir. 1997), the Eleventh Circuit Court of Appeals stated:

> Consistent with the court's directive in *Firestone,* we have adopted three standards of review for plan interpretations: (1) *de novo,* applicable where the plan administrator is not afforded discretion, (2) arbitrary and capricious when the plan grants the administrator discretion, and (3) heightened arbitrary and capricious where there is a conflict of interest.

The Plan at issue here clearly confers upon the Pension Board discretion to interpret, construe and carry out the provisions of the Plan. (Document #61, Exhibit F, ¶ 6). As a product of the discretion afforded the Board the appropriate standard of review would be that of arbitrary and capricious. The remaining threshold interest is whether Mrs. Gregg has established the existence of

---

[2]     The standard of review is the same for decisions of administrators or fiduciaries. *See Marecek v. Bellsouth Services, Inc,* 49 F.3d 702, 705 n.1 (11th Cir. 1995); *Brown v. Blue Cross and Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1560 (11th Cir. 1990), *cert. denied*, 498 U.S. 1040 (1991).

a conflict of interest.  The plan provides in pertinent part:

> To provide funds for the payment of pensions and other benefits provided by the Plan, contributions will be made by the Company and other Employers to the Trustee at such time, or times, and in such amounts as the Company shall determine by action of its Board of Directors.  Such contributions will be held by the Trustee as a Trust Fund and administered and distributed in accordance with all the terms and conditions of the Pension Trust Agreement.

(Document #61, Exhibit F, ¶ 3).

The Plan further provides:

> The administration of the Plan shall be by a Pension Board of five officers and/or employees of the Company, at least three of whom shall be officers. Members of the Pension Board shall be responsible to the Board of Directors of the Company.

(Document #61, Exhibit F, ¶ 5).

The fact that the board reviewing the plan is comprised of officers and employees of the company presents the facial possibility of a conflict of interest when coupled with the fact that the trust fund is periodically funded by Goodyear. *See Adams v. Thiokol Corp.*, 231 F.3d 837, 842-43, n.6 (11th Cir. 2000); *Newell v. Prudential Insurance Company of America*, 904 F.2d 644, 650-51 (11th Cir. 1990).  The review standard for Plan interpretation here is most appropriately a "heightened arbitrary and capricious" test. This is the standard that will be applied to Mrs. Gregg's claim that the Board acted arbitrarily and capriciously in rejecting her argument of substantial compliance out of hand when it determined that the plan requires strict compliance with the procedures under the pension plan.

Standard of Review for Factual Determinations

The Pension Board's interpretation of the Plan's terms is not the primary issue in this case. The primary focus here involves the Board's factual findings "that the application for disability was not valid because it was executed after [Don] Gregg's death when the Power of Attorney was no longer effective."

In *Paramore, supra* at 1451, the court extended the arbitrary and capricious standard of review to factual findings in instances in which the ERISA plan granted the administrator discretion. The court held that "where the plan affords the administrator discretion, the administrator's fact-based determinations will not be disturbed if reasonably based on the information known to the administrator at the time the decision was rendered." *Id.* While the Eleventh Circuit Court of Appeals has not specifically addressed whether there is a heightened arbitrary and capricious standard of review for factual findings when the administrator had both discretion and a conflict of interest, the district court in the Middle District of Alabama has addressed this precise situation.

In *Lake v. UNUM Life Insurance Company of America,* 50 F. Supp.2d 1243, 1252 (M.D. Ala. 1999), Judge Myron Thompson held that where the Plan afforded the plan administrator discretion, as here, and the administrator had a conflict of interest as here, the heightened arbitrary and capricious standard of review should apply to findings of fact. The court's conclusion is persuasively supported by the court's observation that "a conflict of interest could have an equally pernicious effect on plan administrator's factual determination as on the interpretation of a contract term." Judge Thompson further set forth the analysis to be used:

> [T]he burden-shifting analysis developed by the
> Eleventh Circuit for use in plan-interpretation cases
> must be modified in part to render it applicable to
> cases involving challenges to factual determinations.
> Two aspects of the analysis require modification.

5

> First, the first part of the burden-shifting analysis in a plan-interpretation case is determining whether the claimant's interpretation of the plan is reasonable; in analyzing factual determinations, the court will instead examine whether the claimant has shown that her version of the facts is supported by the record. Second, because the principle of *contra proferentem* is a guide to contract interpretation holding that contract terms must be construed against the drafter, it clearly does not apply to review of factual determinations. Therefore, the court will amend the second part of the burden-shifting analysis as follows: if the claimant shows that her factual allegations are supported in the record, the court will draw all inferences from the facts against the plan administrator, to find that the administrator's factual determinations are wrong. The rest of the analysis requires no modification: the will court determine whether the plan administrator was arbitrary and capricious in making its factual determinations, placing the burden upon the administrator to establish that its action was not tainted by self-interest; and, if the administrator carries its burden, the court will allow the claimant to show by other measures that the factual determination was arbitrary and capricious.

50 F. Supp. 2d at 1253.

I.    Whether Goodyear survives the heightened arbitrary and
      capricious standard of review for its factual determination that
      Don's retirement application was executed after Don's death.

            Mrs. Gregg argues first and foremost that she is entitled to survivor benefits under

the plan because Don Gregg had retired on disability at the time of his death. Mrs. Gregg argues

that pursuant to the power of attorney given to her by Don Gregg, she signed the paperwork

necessary to retire Don Gregg prior to Don Gregg's death and the resulting expiration of the power

of attorney. The first question under Judge Thompson's test is whether Mrs. Gregg's contention is

supported by the record.

6

The court was not provided with a copy of that portion of the plan pertaining to benefits available to a spouse; however, the benefit manager quoted and summarized certain provisions which are applicable here. Mrs. Gregg has not disputed that accuracy of the quotation and summary. Mr. Poyhonen stated:

> As Mr. Gregg's spouse at the time of his death, the only benefits that could be available to Mrs. Gregg under the Goodyear Tire & Rubber Company – 1950 Pension Plan (Plan) would be provided under Article V, Section 1. Pre-Retirement Benefits or under Article V, Section 2 Post-Retirement Option.
>
> Article V, Section 1 which describes Pre-Retirement Benefits states that:
>
>> The surviving spouse of a married Employee or former Employee who has at least one hour of service or is on paid leave after August 22, 1984, who is entitled to a pension under the provisions of Article III as in effect on the date of his death, and who dies prior to commencement of retirement benefits under the Plan will be covered by the Pre-Retirement Benefit described in this Paragraph 1 in lieu of a pension otherwise payable under the Plan; provided that the deceased Employee or former Employee has been married to the surviving spouse throughout the one-year period ending on the date of his death; and provided, former Employee did not elect, with spousal consent, to waive the Pre-Retirement Benefit provided hereunder.
>
> Based on the fact that Mr. and Mrs. Gregg were married for a period of less than two months prior to Mr. Gregg's death, and not throughout the one-year period ending on the date of his death, Mrs. Gregg is denied Pre-Retirement Benefits under the Plan.

(Document #61, Exhibit A, p.1).

Mrs. Gregg does not contend that she is entitled to pre-retirement benefits as she and Don were not

married for the one year period ending on the date of his death.  Mr. Poyhonen continued:

> Under Article V, Section 2 of the Plan, the Post
> Retirement Option is explained.  The Post Retirement
> Option provides that:
>
>> Upon filing a written application with the
>> Pension Board at the time and under the
>> conditions set forth in this Paragraph 2, an
>> Employee who retires or otherwise terminates
>> employment on or after May 1, 1994, under
>> conditions entitling him to a pension under
>> Article III may elect a reduced monthly
>> pension and the Post-Retirement Option
>> described in this paragraph 2 in lieu of any
>> pension otherwise payable under the Plan.
>> Furthermore, an Employee who is married on
>> the date his benefit payments commence
>> automatically shall be deemed to have elected
>> the Post-Retirement Option provided
>> hereunder unless a waiver of such Option,
>> consented to by his spouse, has been filed
>> with the Pension Board.
>
> Article VI of the Plan states that upon filing written
> notice to the Pension Board, an Employee who retires
> under a Normal, Early or Disability Retirement has
> the right to waive the Post-Retirement Option and
> elect, with spousal consent, any other Optional Form
> of Payment under the Plan including Option A, which
> provides a 100% Surviving Spouse benefit.   The
> election of any other form of payment does not
> require that the Employee and Spouse be married
> throughout the one-year period prior to the
> Employers's death.  In the absence of an effective
> retirement, the waiver of the Post-Retirement Option
> and the election of an Optional Form of Payment, the
> one-year marriage requirement applies.

(Document #61, Exhibit A, p.2).

Mrs. Gregg asserts she completed the necessary paperwork to retire Don Gregg prior to his death on February 1, 1996.   The benefits manager summarized the evidence relied upon by him in determining that Mrs. Gregg was not entitled to survivor benefits.

> The information provided in the recent memorandum in support of Mrs. Gregg's claim, asserts that Mrs. Gregg, acting under a Power of Attorney, dated January 2, 1996, signed the Pension documents prior to Mr. Gregg's death.  She asserts that the meeting arranged to sign Pension documents began by 3:45 p.m., at the latest, on February 1, 1996 and that all documents were signed prior to 4:00 p.m. on that date.  Ms. Gregg did not first assert that paperwork was completed before Mr. Gregg died until two years after his death, moreover, David Tolleson, Manager of Safety, Health and Worker's Compensation, at the Goodyear Gadsden Plant has indicated, in an affidavit January 14, 1999, that the meeting did not begin until 4:10 p.m. on February 1,1996.   Lloyd Matthew, Benefits, Pension and Insurance Representation, USWA Local 12, in a deposition dated November 5, 1998, states Tammy Gregg did not arrive for the meeting until "right at 4:00 p.m."at which time the meeting began.  Joey Gregg, son of Billy Ladon Gregg, in an affidavit dated January 14, 1999, has further confirmed that he and Tammy Gregg did not arrive at the meeting prior to 4:00 p.m. on February 1, 1996 and that Tammy Gregg did not begin to sign Pension paper work until after 4:30 p.m.  Based on all of the evidence available to the Plan Administrator, Mr. Gregg died prior to Mrs. Gregg's execution of the Pension Plan documents, and therefore, the Power of Attorney was null and void.  On that basis, Mr. Gregg's Disability Retirement and election of Option A are denied, and due to the fact that Mr. and Mrs. Gregg were married less than one year on February 1, 1996, no Surviving Spouse benefits are payable to Mrs. Gregg.

(Document #61, Exhibit A, p.2).

9

When Mrs. Gregg appealed to the Pension Board she submitted the July 12, 2000

statement of A. Brand Walton, the July 17, 2000 declaration of Deborah Dugger and the July 17,

2000 Declaration of Kera Duvall. In its July 26, 2000 appeal decision the Pension Board stated:

> The record contains contradictory evidence with
> respect to the claim that Billy Ladon Gregg actually
> retired before his death, by virtue of Tammy Gregg
> executing the Pension application through a Power of
> Attorney.    Claimant's deposition and testimony
> claims in elaborate detail how the meeting at which
> she executed the Pension application ("Pension
> Meeting") began right after 3:30 p.m. on February 1,
> 1996.  The Pension Board makes a finding of fact that
> the Pension Meeting did not begin before Billy Ladon
> Gregg's death based on the whole record, including
> evidence of the Death Certificate stating the time of
> death was at 4:00 p.m. on February 1, 1996; Lloyd
> Matthew's deposition stating the Pension Meeting
> started at 4:00 p.m.; the notes of Goodyear's
> representative responsible for filling out pension
> applications, David Tolleson, reflecting the meeting
> started at 4:10 p.m.; and Joey Gregg's affidavit stating
> that he and Claimant arrived for he Pension Meeting
> a 4:00 p.m. or later. The Pension Board find that the
> application for a disability pension was not valid
> because it was executed after Billy Ladon Gregg's
> death when the Power of Attorney was no longer
> effective.

(Document #61, Exhibit E, p.3).

Mrs. Gregg's factual contention that she signed the retirements prior to Don Gregg's death is not

supported by the record. Mrs. Gregg is the lone participant at the meeting contending that the

retirement papers were signed prior to Don Gregg's death.[3]

---

[3]    The statement of Mr. Walton is not helpful on this issue because he was not present a the February 1, 1996
meeting at which the paperwork was signed; therefore, he could not personally vouch for the fact the meeting
began at 3:30 rather than 4:00.  Further, he recognized that there was a dispute of fact as to whether Don Gregg
died before or after the execution of the retirement paperwork.  The declaration of Ms. Dugger is also not
helpful.  While Dugger's declaration would indicate that Mrs. Gregg arrived at Goodyear shortly after 3:00
p.m., the declaration does not establish when the meeting began or when it ended.  Dugger specifically stated

As Mrs. Gregg's factual allegations are not supported by the administrative record,

the court need not draw all inferences from the facts against the benefits manager and the pension

board to find their factual determinations are wrong. Based on the fact that Tolleson, Matthews and

Joey Gregg all maintained that the meeting began at or after 4:00 p.m., the factual findings of the

benefits manager and board were reasonable based on the information known at the time the

decisions were rendered. Goodyear did not ignore any pertinent evidence on the issue of whether

the retirement papers were signed prior to Don Gregg's death.[4]  The court concludes that

Goodyear's factual finding that Don Gregg died prior to Mrs. Gregg's signing of the retirement

papers is neither arbitrary and capricious nor motivated by self-interest.

II.     Whether Goodyear survives the heightened arbitrary and capricious
        standard of review for its legal interpretation of the Plan and that the
        Plan required strict compliance with the procedures for retirement.

Alternatively, Mrs. Gregg argues that she substantially complied with the requirement

for a pension application prior to Don Gregg's death. The benefits manager stated:

> In addition, Mrs. Gregg claims that she and Mr.
> Gregg made the proper parties aware of Mr. Gregg's
> intention to retire prior to his death, and, therefore
> benefits are payable to her. The Depositions of Mrs.
> Gregg and Lloyd Matthews stated that Mr. Gregg
> communicated with Lloyd Matthews his desire to
> provide as much as possible to Mrs. Gregg following
> his death. Mr. Matthews has stated in his deposition
> of November 5, 1998 that Mr. Gregg intended on
> overcoming his illness, and was informed that it was
> most advantageous to retire as close to death as
> possible so as to maximize Life Insurance Benefits,
> which begin to reduce following retirement. In

---

that she [Dugger] waited in the car while Mrs. Gregg went in the Goodyear office and that "they were in there
a long time." The declaration of Duvall does not have any bearing on when the paperwork was signed but
arguably relates only to Mrs. Gregg's breach of fiduciary duty claim.

[4]     Ignoring pertinent evidence could indicate that the decision were motivated by self-interest. *See Lake, supra.*

addition, Mr. Gregg, at the time of his death, was receiving Accident and Sickness benefits in an equivalent monthly amount of $ 1,321,67. Accident and Sickness Benefits exceeded his accrued Pension Benefits by over $200 per month and would have stopped following his retirement.

However, Mr. Matthews is not an employee or agent of the Company, or a representative of the Plan Administrator, for purposes of Benefit Plan applications or decisions. He is an official of the Local Union representing its members employed by Goodyear at the Gadsden Plant.   There is no information, which would indicated that any Company representative, David Tolleson in particular, had discussed with Mr. Gregg his intention to retire or the urgency of his need to retire.

(Document #61, Exhibit A, pp.2-3).

On appeal, Mrs. Gregg relied on the statement of A. Brand Walton who concluded that benefits were

payable under the doctrine of substantial compliance.  In his facts in support of this conclusion,

Walton stated:

Under the procedures in effect at Goodyear's facility in Gadsden, Alabama, a collective bargaining unit employee who desires to take retirement takes his application to Lloyd Matthews, the union business agent. On or about January 2, 1996, Don and Tammy went to see Lloyd Matthews.  They explained Don's condition to Mr. Matthews, his likely life expectancy of six weeks, and Don's desire to take retirement in such a form so as to optimize benefits for Tammy. Mr. Matthews stated that he needed a letter from Don's doctor as to his condition and that he would take care of everything.

On January 5, 1996, Don and Tammy had a second meeting with Mr. Matthews who advised them that he now had everything he needed, including the doctor's statement and a copy of the power of attorney.  Don expressed to Mr. Matthews the urgency of getting the retirement papers done as soon as possible.   Mr.

12

Matthews understood that Don and Tammy wanted to elect Option A. Shortly after this meeting, Mr. Matthews relayed the information concerning Don's medical situation and his desire to elect Option a to David Tolleson of Goodyear. David Tolleson is the Manager of Safety, Health and Worker's Compensation at the Gadsden plant.

Tammy attempted to call Mr. Matthews on several occasions after January 5, but he did not return her calls. After being unsuccessful in her attempts to contact Mr. Matthews, Tammy attempted to meet with David Tolleson. Mr. Tolleson refused to see her and advised her that the application for a pension had to be made through Mr. Matthews. Tammy called Goodyear headquarters in Akron and basically got the same response, that is, she was told that she had to go through the "chain of command" in Gadsden.

Between January 5 and February 1, 1996, Tammy attempted to get the retirement papers executed between six and eight times. Finally, through an attorney, she was able to set up a meeting with Goodyear on February 1. At approximately 9:30 a.m. on February 1, 1996, Mark Poyhonen of Goodyear instructed that Tammy be allowed to complete the paperwork for retirement "without delay." The meeting, however, was not scheduled until 3:00 p.m. that day, and it was later postponed for another 30 minutes until 3:30 p.m.

At that meeting, which was held in the union hall in Gadsden, and pursuant to the power of attorney give by Don to Tammy, Tammy elected Option A under the 1950 Pension Plan. Don died at approximately 4:00 p.m. on February 1, 1996. There is a dispute as to whether Don died before or after the execution of the retirement paperwork.

If the factual dispute over the timing of the signing is resolved in favor of the pension election document being signed before Don's death, then benefits would be payable to Tammy under the terms of the Plan. Even if the factual dispute over the timing of the signing of the pension election document is resolved

13

by a determination that it was not signed before Don's death, benefits are still payable to Tammy under the doctrine of substantial compliance or because the actions of Goodyear constitute a breach of fiduciary duty.

(Document #61, Exhibit B, pp.1-2).

The Pension Board found in pertinent part:

In order to retire with a disability pension under Article III, paragraphs 2, the employee must be on total disability for five months prior to retiring or furnish medical evidence to a qualified physician that the total disability results from a terminal illness that will result in death during the five month waiting period. The earliest medical evidence submitted documenting that Billy Ladon Gregg was not expected to live for five months was the letter, dated January 23, 1996, from Dr. Brascho. Upon receiving this letter, David Tolleson sent the official form, the Disability Pension Application-Physician's Report, to Dr. Brascho who filled out the form on January 25, 1996. By this date, Billy Ladon Gregg was in a coma and could not execute the application. A Power of Attorney was faxed from Charles Boyd, Claimant's attorney, on January 31, 1996 at 5:33 p.m., after business hours. The next day, David Tolleson called Akron to see if the Power of Attorney was valid. Mark Poyhonen, in charge of benefit operations, told David Tolleson to proceed using the Power of Attorney, and any question of its validity could be decided afterwards. David Tolleson proceeded to prepare the necessary forms and the Pension Meeting was set up for 4:00 p.m.

The Pension Board finds that the Greggs did not furnish the required documentation needed to retire under a disability pension until the end of January and that Goodyear acted within a reasonable and appropriate time period in setting up the February 1, 1996 Pension Meeting after receiving the necessary documentation. The Pension board finds that based on the total record for this appeal, Goodyear did not unreasonably delay or interfere in allowing Claimant

14

> to make the desired Pension application and that
> Goodyear did not violate any fiduciary duties under
> ERISA.

(Document #61, Exhibit E, pp.2-3).

The Board concluded:

> The Pension Board interprets the Pension Plan to
> require strict compliance with the Plan document, and
> it is affirming that the procedures under the Pension
> Plan require all valid signatures on official forms
> within the applicable time periods, which here would
> be before Billy Ladon Gregg's death.   To do
> otherwise would leave the Pension Plan vulnerable to
> assertions that claimants "almost" complied, with the
> result that there would no longer be any certainty
> about what is required by a participant.   Therefore,
> the Pension Board finds that Claimant is not due a
> survivor benefit under a substantial compliance claim.

(Document #61, Exhibit E, p.3).

Mrs. Gregg argues, that by rejecting her argument of substantial compliance out of hand, the board acted arbitrarily and capriciously.   The court concludes that Goodyear's interpretation of the Plan was legally correct.   In *Phoenix Mutual Life Insurance Company v. Adams*, 30 F.3d 554 (4th Cir. 1994), the Fourth Circuit Court of Appeals recognized that the federal common law of substantial compliance is applicable in the change of beneficiary provisions in an ERISA plan; however, the court specifically limited its holding to the facts before it.   In *First Capital Life Insurance Company in Conservation v. AAA Communications, Inc.*, 906 F. Supp. 1546 (N.D. Ga. 1995), *aff'd*, 104 F.3d 371 (11th Cir. 1996), *reh. and suggestion for reh. en banc denied*, 114 F.3d 1204 (11th Cir. 1997), the district court for the Northern District of Georgia applied the *Pheonix* doctrine of substantial compliance to a change of beneficiary provision.   In both instances, the employee had completed paperwork.   In *Phoenix* the employee had failed to indicate on the form

15

who he wished to change the beneficiary to; however, he did so advise office personnel who could
have made the beneficiary change for the employee but failed to do so. In both cases the beneficiary
change forms were forwarded to the employer who failed to make the beneficiary changes.

While at least one court within the Eleventh Circuit recognizes the doctrine of
substantial compliance in the context of change of beneficiaries provisions of an ERISA plan, there
is no Eleventh Circuit precedent that recognizes the doctrine of substantial compliance in the context
of change of employment status. In *Phoenix*, the court specifically limited its holding:

> We do not hold that the federal common law of
> substantial compliance is applicable in any context
> other than that before the court in the instant case, the
> change of beneficiary provision in an ERISA plan.
> Thus, we limit our holding to the fact before us. Such
> a holding comports with ERISA's purpose to benefit
> insured employees and their beneficiaries.

30 F.3d at 565.

There is a profound difference between allowing an insured employee, through the doctrine of
substantial compliance, to change a beneficiary on a life insurance policy which is already in effect
and allowing an employee to change his status from active employee to retired employee in order
to obtain benefits to which the employee or his spouse would not be entitled in the absence of the
change of status.[5]

> Under the heightened standard, we must first
> determine the legally correct interpretation of the
> disputed plan provision.   If the administrator's
> interpretation was legally correct, the inquiry ends. If
> the administrator's interpretation differs, we must
> then determine whether the administrator was
> arbitrary and capricious in employing a different
> interpretation.

---

[5]     This would be akin to allowing the completion of a life insurance application after the insured had already died.

16

*Adams*, 231 F.3d at 843.  See also *Collins v. American Cast Iron Pipe Co.*, 105 F.3d 1368, 1370 (11th

Cir. 1997).

Because the court concludes that Goodyear's interpretation of the plan to require

strict compliance is legally correct, the inquiry ends.

III.    Whether Goodyear breached its fiduciary duty
        by delaying the retirement of Don Gregg.

Mrs. Gregg alternatively maintains that Goodyear breached its fiduciary duty owed

to Don Gregg by delaying the retirement of Don.  A plan fiduciary is required under 29 U.S.C. §

1104(a)(1)(B) to act with the "care, skill, prudence and diligence under the circumstances then

prevailing that a prudent man acting in a like capacity and familiar with such matters would use in

the conduct of an enterprise of a like character and with like aims."

The benefits manager stated:

> However, Mr. Matthews is not an employee or agent
> of the Company, or a representative of the Plan
> Administrator, for purposes of Benefit Plan
> applications or decisions.  He is an official of the
> Local Union representing its members employed by
> Goodyear at the Gadsden Plant.   There is no
> information, which would indicate that any Company
> representative, David Tolleson in particular, had
> discussed with Mr. Gregg his intention to retire or the
> urgency of his need to retire.
>
> Finally Mrs. Gregg claims that Goodyear breached its
> Fiduciary Duty to her and Mr. Gregg due to the
> assertion that Goodyear had actual knowledge of the
> severity of Mr. Gregg's condition.   Based on
> information available, Company Representative
> David Tolleson knew that Mr. Gregg had cancer, but
> didn't learn of the severity of his condition until
> contacted by Lloyd Matthews on February 1, 1996.
> In fact, Dave Tolleson was only sent, by facsimile, a
> copy of the Power of Attorney at 5:31 p.m. on
> January 31, 1996.  The Plan Administrator, who is

17

> located at Corporate Headquarters, first learned of the
> Power of Attorney on February 1, 1996 and instructed
> that Mrs. Gregg be allowed to complete the Pension
> paperwork without delay and that the legitimacy of
> the Power of Attorney could be determined at a later
> dat e. A meeting was promptly scheduled for that
> purpose at 4:00 p.m. on February 1, 1996.    In
> addition, it wasn't until February, 1998 that Goodyear
> had even become aware of Mrs. Gregg's contention
> that she completed the Pension Application and the
> election of Option A prior to Mr. Gregg's death.
> Goodyear, as Plan Administrator, finds that there
> were no breaches of Fiduciary Duty. The fact is that
> a meeting with Mrs. Gregg was arranged immediately
> upon learning that Mrs. Gregg had a Power of
> Attorney to act on Mr. Gregg's behalf.

(Document #61, Exhibit A, p.3).

On appeal, the board had before it the statement of Brand Walton who stated:

> Based upon the above facts, and based on my
> understanding of the rules and standards of conduct
> applicable to fiduciaries [as previously set out in the
> discussion on substantial compliance], I am of the
> opinion that Goodyear, acting through its employees
> and agents, committed a breach of fiduciary duty in
> connection with its handling of Don's pension
> application. While the taking of an application for a
> pension is not normally the performance of a
> fiduciary act, we have a situation in this case where
> the person charged with that responsibility failed to
> process the application for a period of almost a
> month, knowing full well the urgency of the situation.
> This egregious behavior was not confined to one
> individual. Mr. Matthews relayed the information
> concerning Don's condition and his desires to at least
> one management employee of Goodyear who did
> nothing to remedy the dilatory tactics of Goodyear's
> agent, even after Tammy had contacted him
> personally to seek help. It was not until February 1,
> 1996, and after having sought the assistance of two
> Gadsden attorneys, that the Manager of Benefits
> Operations, M.A. Poyhonen instructed the Gadsden

> plant to permit Tammy to execute the pension application "without delay."

> On a regular basis, I give advice to employers, administrators, and others with respect to questions involving plan administration and the processing of benefit claims. I am charged with responsibility for handling benefits claims at my own firm. It is readily apparent that those people charged with plan administrative responsibility in Goodyear's Gadsden location either did not seek advice in this case (at least not until January 31, 1996) or that they ignored such advice.

(Document #61, Exhibit B).

The Board further had the affidavit of Kera Duvall who stated

> I remember Tammy Gregg being on the phone talking to people at Goodyear and not being unable to get something done. Three or four times in the beginning her trying talking to someone and asking about what she needed to bring when she and Don came to the office. They never would give her a time or date. Later, Tammy tried again but again got no results, so Tammy called a lawyer to try to get a time set to complete the necessary paperwork. Tammy couldn't understand why she and Don couldn't have completed the paperwork earlier while they were there and why Goodyear made it so hard, especially considering what they were going through.

(Document #61, Exhibit D).

As previously set out, the Board found:

> The Pension Board finds that the Greggs did not furnish the required documentation needed to retire under a disability pension until the end of January and that Goodyear acted within a reasonable and appropriate time period in setting up the February 1, 1996 Pension Meeting after receiving the necessary documentation. The Pension Board finds that based on the total record for this appeal, Goodyear did not unreasonably delay or interfere in allowing Claimant

19

> to make the desired Pension application and that Goodyear did not violate any fiduciary duties under ERISA.

(Document #61, Exhibit E, p.3).

The Board found:

> The timing of an employee's retirement can have significant financial implications. For example, the Optional Life Insurance Plan provides that the amount of insurance coverage begins reducing at retirement by twenty-five percent a quarter, so that there is no coverage left a year after retirement. Therefore, an employee who becomes terminally ill may attempt to delay retirement until the latest possible date, as it appears Mr. Gregg did here.
>
> Lloyd Matthews stated in his deposition that Billy Ladon Gregg asked him what was best for retiring. Lloyd Matthews explained the financial advantages of retiring as close to death as possible, but stressed the need and importance of actually retiring, by signing the pension application, before his death. Lloyd Matthews told the Greggs to tell him when they wanted to move on filling out the pension application and that he relayed to David Tolleson that he was waiting for Billy Ladon Gregg to tell him when.

(Document #61, Exhibit E, p.4).

The Board concluded:

> Lloyd Matthews, a union employee representative, is an agent of the union members and not an agent of the Company. The Pension Board finds that nothing in these circumstances changes that relationship, therefore, his knowledge and actions are not attributable to the Company.
>
> The Pension Board finds that Goodyear properly investigated the facts and supplied appropriate information in response to Claimant's application and

> claim for benefits, and Goodyear, as Plan
> Administrator, did not breach its fiduciary duties.

(Document #61, Exhibit E, p.4).

The finding that Matthews was the agent of Don Gregg rather than Goodyear is

supported by the record and unrefuted. Inaction, if any, on the part of Mr. Matthews may not be

imputed to Goodyear. Moreover, once Tolleson, Goodyear's agent, was informed on February 1,

1996 that the retirement paperwork on Don Gregg required immediate attention, steps were taken

to ensure that the paperwork was completed that very day. While minutes ultimately became

crucial, the court concludes that the delay of approximately six hours cannot constitute a breach of

fiduciary duty.

IV.    Whether Jeff and Joey Gregg are liable to Mrs. Gregg
       based on interference with ERISA benefits.

Finally, the court considered the claim made against Jeff and Joey Gregg for

interference with ERISA benefits. 29 U.S.C. § 1140 provides:

> It shall be unlawful for any person to discharge, fine,
> suspend, expel, discipline, or discriminate against a
> participant or beneficiary for exercising any right to
> which he is entitled under the provisions of an
> employee benefit plan, ... or for the purpose of
> interfering with the attainment of any right to which
> such participant may become entitled under the
> plan....

Jeff and Joey Gregg argue in their amended motion for summary judgment that §

1140 does not apply to them because the term "discriminate" is limited to actions that affect the

employer–employee relationship. In *Mattei v. Mattei*, 126 F.3d 794, 808 (6ᵗʰ Cir. 1997), *cert.*

21

*denied,* 523 U.S. 1120 (1998) the court held that the terms within § 1140 reach beyond the employment relationship.[6] The court in *Mattei* also held:

> If a claim against a "person" who is a third party–that is, a person who is not involved in the funding or administration of the ERISA plan in question–is to survive a motion to dismiss, a plaintiff ordinarily must have alleged that the defendant possesses either responsibility for funding the plan, or a conflicting claim to either the disputed benefit or the funds underlying it. Without this factual predicate, it will be all but impossible to demonstrate a motive supporting the requisite "specific intent of violating ERISA." *See Roush v. Weastec,* 96 F.3d 840, 845 (6th Cir. 1996).

Jeff and Joey Gregg argue that Mrs. Gregg fails to satisfy either of these requirements. Mrs. Gregg responds that her allegations in support of her interference claim "support the inference[ ] that [Jeff and Joey] possessed some control over either the benefit or its underlying funds" which the court in *Mattei* said was all that was necessary to state a valid interference claim. 126 F.3d at 808. The court further recognized that in interference claims, the alleged illegal action will have a causal connection to the plaintiff's ability to receive an identifiable benefit. *Id*. In her response to the amended motion for summary judgment Mrs. Gregg alleges

> [T]he evidence shows that on one occasion in January, Tammy went to the union hall, and Jeff and Joey Gregg were there meeting with Mr. Lloyd Matthews and someone else. To avoid a confrontation, she left, but she overheard Jeff or Joey Gregg threatening that "if they did anything to give [her] any pension or any life insurance policy or anything, that they would sue." (T. Gregg Dep. at 156-157). They were constantly at the union hall attempting to undermine Tammy's attempt to make

---

[6]      *Contra, Deeming v. American Standard, Inc.,* 905 F.2d 1124, 1127 (7th Cir. 1990); *McGath v. Auto Body North Shore, Inc.,* 7 F.3d 665, 668-69 (7th Cir. 1993).

the benefit elections and undermine her carrying out Don Gregg's wishes. (T. Gregg Dep. at 125). Later, on February 1, 1996, Jeff and Joey insisted that one of them be present at the meeting that was finally scheduled to execute the documents for the benefit elections and insisted that they get part of the pension benefits. (T. Gregg Dep. at 17-19). During the meeting, Joey became very angry, went into a rage, and pitched a fit, hurling verbal abuse at Tammy and threatening to hit Mr. Boyd. (T. Gregg Dep. at 19-21, 65-67, 71-75, 83, 163-165). At one point, when Tammy told Joey that she was not going to do what he wanted, Joey "was going to come after her" and was going for her throat. (T. Gregg Dep. at 164). These threats, attempted physical attacks, and verbal abuse were intended to, and did in fact, interfere with Tammy Gregg's election of benefits. Tammy met with Joey for three or four minutes during this meeting. (T. Gregg Dep. at 83). After the meeting and after Don Gregg died, Joey threatened Tammy's life, tried to attack her, and it took four people to hold him back. (T. Gregg Dep. at 127, 129). Jeff also made a threatening comment about knowing what she had done. (T. Gregg Dep. at 127-129). Later, Joey threatened to "keep [her] in court as long as possible," stating that she "would never get a dime" and that "he didn't care how long it took." (T. Gregg Dep. at 133).

(Document #60, p.2).

In his affidavit, Joey Gregg stated:

On the afternoon my father died, I heard Tammy talking to Lloyd Matthews at about 3:00 p.m. about coming down for a meeting. When I asked her where she was going, Tammy said she had to go take care of some bills for houses that she had. I told her I knew she was going to the union hall. She then admitted this was true. My brother Jeff and I then asked her to talk to us about the pension. This was about 3:15 p.m. My brother and I were concerned that she had only been married to our dad for a month and was going to apply for a pension payable all to her and none to us. She said she would make out the papers so she would get one-half of the monthly pension and

Jeff and I would get the other half of the monthly pension. However, she did not want me or my brother to go to the union hall with her. After some discussions she agree to let me ride with her to the union hall.

We left dad's house in Hokes Bluff at about 3:45 p.m. We drove about fifteen minutes to the union hall in East Gadsden. It was 4:00 p.m. or later when we arrived. Mr. Tolleson from Goodyear explained the various options on the pension for at least ten or fifteen minutes. Then Tammy turned to me and said, "Let's go with Option A because there's more money and then I'll take care of you guys." Option A was the option that would pay 100% of the monthly pension to Tammy as dad's spouse. I said no, not unless your agreement to pay us half that money is in writing. David Tolleson said he did not have any paperwork to fix it that way. Tammy then said to me let's go outside the room and discuss it.

Outside the room I said to Tammy that we needed to choose the other option that would pay half the pension to her and half to me and Jeff. She said no, let's do it where there's more money per month, and I'll have a document written up by a lawyer later about splitting that money. I said that her lawyer Charles Boyd was here at the union hall, so let's write it down right now. She said no we'll write down later. I said I needed to call Jeff. As I walked to the phone I saw Tammy dash back into the conference room I went back in too without calling Jeff to see what she was doing. I heard her tell David Tolleson that me and her and Jeff agreed on going with Option A.

When I heard Tammy say that to David Tolleson I said that Jeff and I do not agree to what Tammy is saying. By this time it was right at 4:30 p.m. She started to sign the pension papers. I said are you guys going to let her do this. No one said anything. I left the room to call Jeff. When I reached Jeff he told me daddy had died and that he had already called the union hall with that message. I told Jeff to pick me up and that I would not ride back with Tammy.

24

. . .

> I never went into a rage, pitched a fit, verbally abused
> Tammy, or threatened to hit Mr. Boyd. I also did not
> make the remark to Charles Matthews attributed to
> me by Tammy Gregg that "if they did anything to
> give [her] any pension or any life insurance policy or
> anything, that they would sue.

(Document #40, pp.2-4).

The court assumes for the purpose of this order that Mrs. Gregg's allegations are sufficient to show that Jeff and Joey possessed a conflicting claim to the disputed benefits; however, there is no evidence that Jeff and Joey possessed any control over the benefit. The court must reject Mrs. Gregg's argument that "Jeff and Joey's intimidation tactics constituted some constructive control over the benefits or the timing of the paperwork for electing the benefits." The court cannot expand the holding of *Mattei* to allow Mrs. Gregg to demonstrate only "constructive control" or control over the timing of the paperwork as opposed to control over the benefit in satisfying the second requirement.

Based on the foregoing the court concludes that defendant Goodyear is entitled to judgment in its favor based on the court's review of the administrative record. The court further concludes that Jeff and Joey Gregg are entitled to summary judgment on plaintiff's claim of interference with ERISA benefits.

To the extent that the state law claims of defendants Jeff and Joey Gregg against Tammy Gregg remain, the court declines to exercise supplemental jurisdiction as the district court has dismissed all claims over which it has original jurisdiction and the state law claims are due to be dismissed. See 28 U.S.C. § 1367.

25

A separate Final Judgment consistent with this memorandum of opinion will be entered simultaneously herewith.

As to the foregoing it is SO ORDERED this the $\underline{21}^{th}$ day of January, 2001.

PAUL W. GREENE
UNITED STATES MAGISTRATE JUDGE

26